UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

JESUS QUINTANA,                         :

                        Plaintiff,      :     15 Civ. 6473 (HBP)

     -against-                          :     OPINION AND
                                              ORDER
CAROLYN W. COLVIN, Acting               :
Commissioner of Social Security
                                        :

                        Defendant.      :

----------------------------------X


          PITMAN, United States Magistrate Judge:


I.   Introduction


          Plaintiff brings this action pursuant to section 205(g)

of the Social Security Act (the "Act"), 42 U.S.C. § 405(g),

seeking judicial review of a final decision of the Commissioner

of Social Security ("Commissioner") denying his application for

supplemental security income ("SSI") and disability insurance

benefits ("DIB").  Both plaintiff and the Commissioner have moved

for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure (Docket Items ("D.I.") 19, 25).

Both parties have consented to my exercising plenary jurisdiction

pursuant to 28 U.S.C. § 636(c) (D.I. 12).  For the reasons set

forth below, plaintiff's motion is denied and the Commissioner's motion is granted.

II.   Facts[1]

    A.   Procedural Background

        In plaintiff's applications for SSI and DIB he alleged that he became disabled on July 19, 2011 due to asthma,[2] aller- gies and eczema[3] (Tr. 82, 156-62, 182-83).   Plaintiff later amended his applications to claim that he was also disabled due to sleep apnea[4] and a right knee impairment (Tr. 26).   The claims were initially denied by the Social Security Administration on September 20, 2012 (Tr. 82-88).   Plaintiff requested a hearing, and an Administrative Law Judge ("ALJ") conducted a video hearing

---

[1]I recite only those facts relevant to my review.   The administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) (See Notice of Filing of Administrative Record, dated October 21, 2015 (Docket Item 13) ("Tr.")) sets out plaintiff's medical history more fully.

[2]Asthma is a condition that causes a person to have recurrent attacks of shortness of breath "with airway inflammation and wheezing due to spasmodic contraction of the bronchi." Dorland's Illustrated Medical Dictionary ("Dorland's") at 168 (32nd ed. 2012).

[3]Eczema is a skin condition and refers to "any of various [itchy] papulovesicular types of dermatitis occurring as reactions to endogenous or exogenous agents." Dorland's at 592.

[4]Sleep apnea refers to "transient periods of cessation of breathing during sleep." Dorland's at 117.

on December 23, 2013 during which plaintiff, who was represented by an attorney, testified on his own behalf (Tr. 42-73).  On May 14, 2014, the ALJ issued a decision finding that plaintiff was not disabled (Tr. 24-34).  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on June 18, 2015 (Tr. 1-3).

B.   Social Background

Plaintiff was born in 1972 and was 39 years old at his alleged onset date (Tr. 178).  Plaintiff completed the eleventh grade and was trained as an auto mechanic (Tr. 183).  Plaintiff worked as a mechanic's assistant for a sanitation company from 1989 to 1998 (Tr. 66, 229-30).  Plaintiff subsequently worked as a sales associate for a beer company from 1998 through his alleged onset date in 2011 (Tr. 229).  The latter job involved driving a truck to deliver cases of beer and beer displays and setting up the displays (Tr. 66-67, 183, 231).

In documentation dated August 31, 2012, plaintiff reported to the Social Security Administration ("SSA") that he lived in an apartment with his parents (Tr. 190).  Plaintiff stated that he was able to shower, iron his clothes, repair holes in the walls and put away laundry (Tr. 191-93).  Plaintiff went outside every day, usually to the park, and would walk at a slow

3

pace, so as to not "over exert" himself (Tr. 191, 193, 195).
According to plaintiff, he could walk three blocks before needing
to take a rest (Tr. 197), and would lose his breath climbing
stairs (Tr. 196, 193, 196).  Plaintiff stated that, at his
previous job, lifting cases of beer frequently caused shortness
of breath that was so severe that he needed to sit down (Tr.
195).  Plaintiff indicated that his social life had not changed
as a result of his medical condition and that he went to the
movies, went fishing and visited his children (Tr. 195).

C.   Medical Background[5]

1.   Dr. Rajesh Patel

The record contains treatment notes from family-
medicine practitioner Dr. Rajesh Patel prior to plaintiff's
alleged onset date.  Plaintiff saw Dr. Patel on May 2, 2008 and
his chief complaint during that visit was an asthma attack which
had lasted for three days (Tr. 255-56).  The medical history
indicates that plaintiff had asthma since 2007 and allergic
rhinitis[6] since 1985 (Tr. 255).  Dr. Patel diagnosed plaintiff

---

[5]Plaintiff testified at the hearing that there was a gap in
his treatment records from 2011 through mid-2013 because he did
not have medical insurance during that time (Tr. 57-58).

[6]Allergic rhinitis is "a general term used to denote any
(continued...)

4

with "unspecified asthma without mention of status asthmaticus,"[7] which was "chronic controlled," and "contact dermatitis and other eczema," which was also "chronic controlled" (Tr. 255-56).  Dr. Patel prescribed Lidex cream, Singulair, Benadryl and an albuterol inhaler[8] (Tr. 256).

2.   Treatment at Medinova Physicians

a.   Treatment Prior to
Alleged Onset Date

Plaintiff was seen by Dr. Vijay Alla at Medinova Physicians ("Medinova") on January 7, 2010, complaining of a rash on his face, itching all over his body and swollen eyes (Tr. 366).  During that visit, plaintiff stated that he had no short-ness of breath when at rest, but that he did experience shortness of breath upon exertion (Tr. 366).  Plaintiff reported that his shortness of breath improved when he rested or used his inhaler

---

[6](...continued)
allergic reaction of the nasal mucosa; it may occur perennially." Dorland's at 1639.

[7]Status asthmatiticus refers to "a particularly severe episode of asthma that does not respond adequately to ordinary therapeutic measures and may require hospitalization."  Dorland's at 1767.

[8]Albuterol is administered by inhalation for the treatment of bronchospasm associated with various conditions including asthma.  Dorland's at 45.

(Tr. 366).  Plaintiff also reported that he had a history of snoring and that he fell asleep at the wheel of his car, but also reported that his breathing problems did not wake him up at night (Tr. 366).  Dr. Alla found pigmented lesions on plaintiff's face and hands (Tr. 366).  He diagnosed plaintiff with a rash and another nonspecific skin eruption and prescribed Elidel cream, Temovate cream and Pataday solution (Tr. 367).

Dr. Alla also found that plaintiff had decreased breath sounds bilaterally, but no wheezing, rhonchi[9] or rales[10] (Tr. 366).  Dr. Alla also diagnosed plaintiff with "bronchial asthma without mention of status asthmaticus" or acute exacerbation (Tr. 366).  Dr. Alla continued plaintiff on Singulair and also prescribed Symbicort and Ventolin inhalers (Tr. 367).

Plaintiff saw Dr. Alla again on January 21, 2010, for a follow-up visit (Tr. 364).  Dr. Alla found that plaintiff's respiration was clear bilaterally, and that plaintiff had no wheezing, rhonchi or rales (Tr. 364).  Plaintiff complained of blurred vision and a rash, and Dr. Alla continued plaintiff's prescription of Elidel cream for his rash and continued plaintiff

---

[9]Rhonchi refers to a snoring sound.  Dorland's at 1642.

[10]Rales is "a discontinuous sound . . . consisting of a series of short nonmusical noises, heard primarily during inhalation . . . ."  Dorland's at 1576.

6

on Singulair, Symbicort, albuterol and Ventolin for his asthma
(Tr. 364-65).

### b. Treatment After
### Alleged Onset Date

Plaintiff returned to Dr. Alla on June 7, 2013 for a
physical examination (Tr. 300).  Plaintiff complained of having
sharp pain in his right knee that he rated as 7 out of 10 (Tr.
300).  Plaintiff reported that the pain had lasted for a "long
time on and off" (Tr. 300).  Dr. Alla's notes indicate that
plaintiff had no limitation in motion and no trouble walking (Tr.
301).  Dr. Alla prescribed Naprosyn tablets for plaintiff's knee
pain and ordered an x-ray and a magnetic resonance imaging
("MRI") scan (Tr. 301).

During the June 7 visit, plaintiff reported to Dr. Alla
that he had no shortness of breath (Tr. 300).  Dr. Alla examined
plaintiff and found that plaintiff's respiration was clear
bilaterally and that there was no wheezing (Tr. 300).  Dr. Alla
assessed that plaintiff had "bronchial asthma without mention of
status asthmaticus or acute exacerbation" (Tr. 301).  Dr. Alla
prescribed albuterol, Ventolin and Singulair (Tr. 301).

On the same date, plaintiff had an x-ray taken of his
right knee at Madison Avenue Radiology Center (Tr. 305).  The x-
ray showed that there was lateral subluxation at the tibia and a

7

joint effusion[11] indicating internal derangement (Tr. 305).   No fractures, dislocations or bone lesions were observed (Tr. 305). The radiologist recommended that plaintiff have a MRI scan of the right knee (Tr. 305).

On June 27, 2013, plaintiff underwent an MRI examination of his right knee (Tr. 319).   The MRI showed that plaintiff had a full-thickness displaced tear of the lateral meniscus[12] with a meniscal fragment about the lateral joint line, a non-displaced two centimeter tear of the posterior horn medial meniscus, with a moderate grade medial collateral ligament sprain (Tr. 319).

Plaintiff was seen again at Medinova on August 1, 2013, by registered physician's assistant ("RPA") Anna Litvin, to discuss the results of his x-ray and MRI exams (Tr. 297).   RPA Litvin found that plaintiff's respiration was clear bilaterally, with no wheezing (Tr. 297).   Plaintiff was again assessed as suffering from "bronchial asthma without mention of status asthmaticus or acute exacerbation" (Tr. 297).   Plaintiff was

---

[11]Effusion is "the escape of fluid into a part or tissue, as an exudation or a transudation." Dorland's at 595.

[12]A meniscus is a "crescent-shaped structure of the body. Often used alone to designate one of the menisci of the knee joint." Dorland's at 1134.   A lateral meniscus of the knee joint is "a crescent-shaped disk of fibrocartilage, but nearly circular in form, attached to the lateral margin of the superior articular surface of the tibia." Dorland's at 1135.

referred to a pulmonologist for his asthma and for an orthopedic evaluation (Tr. 297-98).

On August 26, 2013, plaintiff was seen by Dr. Alla to obtain medical clearance prior to undergoing a right knee arthroscopy[13] (Tr. 293).  During this visit, plaintiff denied having any shortness of breath either at rest or with exertion (Tr. 297).  Plaintiff also reported that he had not taken his asthma medication for several days (Tr. 295).  Dr. Alla's examination of plaintiff was consistent with his prior examinations; he found no shortness of breath, cough or wheezing (Tr. 294).

Plaintiff was again seen by RPA Litvin on September 17, 2013, for a refill of his medications (Tr. 291).  Plaintiff stated that he could walk a "good number of blocks without any problems," and that he had right knee pain, but "no pain in the legs" (Tr. 291).  The record of that visit indicates that plaintiff was in a good general state of health and that he was able to do his usual activities (Tr. 291).  His respiratory examination was again negative for coughing, shortness of breath or wheezing (Tr. 291).  Plaintiff's assessment and medications remained unchanged from his prior visits (Tr. 292).

---

[13]Arthroscopy refers to the examination of the interior of a joint with an endoscope for the purpose of carrying out diagnostic and therapeutic procedures within the joint. Dorland's at 158.

3.  Dermatologist
    Dr. Hyun-Soo Lee

On December 21, 2013, plaintiff was examined by Dr.
Hyun-Soo Lee, a dermatologist (Tr. 378).  Dr. Lee's notes indi-
cate that plaintiff had numerous erythematous[14] papules and
plaque on his cheeks, neck and body (Tr. 375).  Dr. Lee diagnosed
plaintiff with severe atopic dermatitis and prescribed medica-
tions to treat his skin condition (Tr. 378).

4.  Consulting Examiner
    Dr. Elizama Montalvo

At the request of SSA's Division of Disability Determi-
nation, consulting family-medicine physician Dr. Elizama Montalvo
examined plaintiff on September 10, 2012 (Tr. 283-86).  Plaintiff
told Dr. Montalvo that he had a history of eczema, allergic
rhinitis and asthma and that he had been hospitalized for two
weeks in 2006 because of his asthma (Tr. 283).  Plaintiff re-
ported that his last asthma attack was on July 18, 2012 (Tr.
283).  Plaintiff also reported that he could only walk for three
blocks without having breathing problems and that he would then
have to stop and use his inhaler (Tr. 283).  Plaintiff also

---

[14]Erythema refers to a redness of the skin.  Dorland's at
643.

10

stated that he needed to use his inhaler when climbing the three
flights of stairs to his apartment (Tr. 283).[15]  Plaintiff stated
that he was prescribed albuterol, Claritin, a Ventolin inhaler,
Benadryl, Singulair and Betamethasone cream (Tr. 283).

Dr. Montalvo examined plaintiff and found that plain-
tiff weighed 236 pounds, his gait and stance were normal and that
he did not need an assistive device to walk (Tr. 284-285).
Plaintiff could walk on his heels and toes without difficulty and
squat fully (Tr. 285).  Plaintiff rose from a chair without
difficulty and needed no help changing or getting on and off the
examination table (Tr. 285).  Plaintiff had full range of motion
in his cervical spine, shoulders, elbows, forearms, wrists,
fingers, hips, knees and ankles (Tr. 284).  Plaintiff's joints
were stable and nontender, and plaintiff had no redness, heat,
swelling or effusion (Tr. 284).  Plaintiff had full (5 out of 5)
strength in all extremities, with no sensory deficits (Tr. 284).

Dr. Montalvo also examined plaintiff's chest and lungs
and stated that

> [h]e has poor effort.  Difficulty to expand his diame-
> ter, but I did not hear any wheezing.  Percussion[16]

---

[15]Plaintiff later testified at the hearing before the ALJ
that "we currently moved to the second floor" (Tr. 46).  The
record does not disclose when this move occurred.

[16]Percussion is "the act of striking a part with short,
(continued...)

normal.  No significant chest wall abnormality.  Normal
diaphragmatic[17] motion.

(Tr. 284).

Dr. Montalvo observed that plaintiff had
hyperkeratosis[18] on his upper extremities, face, neck and the
back of his knees and that his skin was very dry, with scaling
and oozing (Tr. 286).

Dr. Montalvo diagnosed plaintiff with asthma, allergic
rhinitis and severe eczema (Tr. 284).  Dr. Montalvo determined
that plaintiff had moderate limitations in walking and climbing
stairs and that plaintiff should avoid dust, environmental
pollutants and smoke (Tr. 284).

    5.  Plaintiff's Knee
        Surgery and Follow-Up Treatment

On August 21, 2013, plaintiff saw orthopedic surgeon
Dr. Neofitos Stefanides (Tr. 315).  Plaintiff told Dr. Stefanides
that he had been experiencing right knee pain since he had

_____

[16](...continued)
sharp blows as an aid in diagnosing the condition of the
underlying parts by the sound obtained."  Dorland's at 1409.

[17]The diaphragm is the "musculomembranous partition
separating the abdominal and thoracic cavities."  Dorland's at
509-10.

[18]Hyperkeratosis refers to abnormal thickening of the outer
layer of the skin.  Dorland's at 890.

tripped a year before and that the pain had been getting progressively worse and adversely affecting the activities of daily living (Tr. 315).  Plaintiff reported that his pain at the time of his examination was 8 out of 10, with periods of worsening pain (Tr. 315).  Plaintiff stated that Motrin and Tylenol provided mild pain relief (Tr. 315).  Plaintiff could walk without an assistive device (Tr. 315).  During this visit, plaintiff denied any coughing, wheezing, chest pain or shortness of breath (Tr. 315).

Dr. Stefanides examined plaintiff and found that plaintiff had an antalgic[19] gait and that plaintiff could kneel and squat with a moderate amount of difficulty (Tr. 315). Plaintiff had positive medial and lateral joint tenderness (Tr. 315).  Dr. Stefanides also found mild effusion (Tr. 315). Plaintiff's range of motion in his right knee was "0-140 without crepitus"[20] and his strength was 4 out of 5 due to pain (Tr. 315).  Dr. Stefanides recommended arthroscopic surgery on plaintiff's right knee (Tr. 316).

---

[19]Antalgic means "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain."  Dorland's at 97.

[20]Bony crepitus refers to the "crackling sound produced by the rubbing together of fragments of fractured bone and joint crepitus refers to "the grating sensation caused by the rubbing together of the dry synovial surfaces of joints."  Dorland's at 429.

There are no records concerning the surgery in the administrative record. However, Dr. Stefanides' medical records indicate that on September 30, 2013, he saw plaintiff for the first post-operative visit (Tr. 313). Plaintiff reported that he was doing well and had mild pain that was well controlled with medication (Tr. 313). Plaintiff did not have any shortness of breath or wheezing (Tr. 313). Dr. Stefanides examined plaintiff and found that he did not have any tenderness at the medial and lateral joint lines and that there was no effusion (Tr. 313). Plaintiff's right knee strength was 5 out of 5 and his range of motion was 0-140 without crepitus (Tr. 313). He had a mildly antalgic gait and had difficulty squatting (Tr. 313). Dr. Stefanides prescribed physical therapy three times a week for 4 weeks (Tr. 314, 363).

Plaintiff began physical therapy on October 8, 2013 (Tr. 362). Physical therapist Howard Krebaum noted that plaintiff rated his pain as 10 out of 10 (Tr. 362). Krebaum found that plaintiff's right knee strength was 3 out of 5, that plaintiff was limited by pain and that plaintiff needed an assistive device to walk (Tr. 362). Krebaum also noted that plaintiff's right knee extension was -5 degrees and that his flexion was tight at 95 degrees (Tr. 362). Plaintiff attended physical

14

therapy on October 10, October 22, October 29, November 5, November 19 and November 21, 2013 (Tr. 356-61).

Plaintiff had a second postoperative visit with Dr. Stefanides on October 21, 2013 (Tr. 311). Plaintiff reported during that visit that he was doing better and that the surgery had reduced his pain by 20% (Tr. 311). Plaintiff stated that he continued to walk with a cane (Tr. 311). Plaintiff also indicated that he was performing his home exercise program as instructed and continuing with his physical therapy regularly (Tr. 311). Plaintiff denied experiencing any shortness of breath or wheezing (Tr. 311).

At the October 21 examination of plaintiff's right knee, Dr. Stefanides found that plaintiff had a range of motion of "5-110 with moderate amount of crepitus" (Tr. 311). His strength was 4 out of 5 due to pain (Tr. 311). Dr. Stefanides observed that plaintiff's knee had a mild varus deformity with moderate effusion (Tr. 311). Plaintiff had an antalgic gait and plaintiff could kneel and squat with a moderate amount of difficulty (Tr. 311). Palpation revealed tenderness at the medial and lateral joint lines and at the patellofemoral joint (Tr. 311).

On October 25, 2013, approximately a month after plaintiff's arthroscopic surgery, Dr. Stefanides completed a

15

Lower Extremities Impairment Questionnaire (Tr. 345-52).  Dr. Stefanides reported that plaintiff experienced constant right knee pain after prolonged standing, walking or climbing of stairs (Tr. 347).  Dr. Stefanides opined that plaintiff could sit for a total of four hours and stand/walk for a total of up to one hour in an eight hour workday, needed to avoid wet conditions, temperature extremes, humidity and heights and could not kneel (Tr 346-52).  Dr. Stefanides opined that plaintiff's symptoms were frequently so severe that he would be absent from work more than three times a month (Tr. 351).  Dr. Stefanides stated that he did not know whether plaintiff's impairments would last at least twelve months (Tr. 350).  Dr. Stefanides opined that plaintiff could initiate and sustain walking with the assistance of a cane (Tr. 347).  Dr. Stefanides further indicated that plaintiff could carry out the activities of daily living independently without assistance, including traveling from his house to appointments, preparing meals and bathing and dressing (Tr. 348).  Dr. Stefanides stated that plaintiff's pain was completely relieved by medication without any unacceptable side effects (Tr. 348).

On November 21, 2013, plaintiff's physical therapist sent a report to Dr. Stefanides, indicating that after five sessions treating his right knee, plaintiff had full extension and strength of 3+ out of 5 (Tr. 354-55).  However, plaintiff's

self-reported lower extremity functional scale ("LEFS") was 7 (Tr. 354-55).[21]

Plaintiff returned to Dr. Stefanides on December 2, 2013, complaining of pain in his knee that worsened at night and when he stood or walked for prolonged periods (Tr. 403). Plaintiff reported that Percocet relieved the pain (Tr. 403). Plaintiff indicated that he had also experienced some relief from the pain after receiving an injection at his last doctor's visit, but that the relief was short lived (Tr. 403). Dr. Stefanides's notes indicate that there had been no change in plaintiff's symptoms since his last visit. Dr. Stefanides advised plaintiff to lose weight and prescribed physical therapy and Orthovisc injections (Tr. 403).

Plaintiff saw Dr. Stefanides again on January 6, 2014, for his first Orthovisc injection (Tr. 405). Dr. Stefanides' notes of the visit indicate that plaintiff continued to walk with a cane but that physical therapy was helping to alleviate his

---

[21]The LEFS is a questionnaire where plaintiff rated the level of difficulty that he has with twenty different activities due to his right knee impairment (Tr. 355). The scale is from zero to eighty and the activities include walking a mile and the ability to get in and out of the bath (Tr. 355). A score of zero for an activity indicates that he has "Extreme Difficulty or Unable to Perform Activity," a score of one indicates that he has "Quite a Bit of Difficulty," a score of two indicates that he has "Moderate Difficulty," a score of three indicates that he has "A Little Bit of Difficulty" and a score of four indicates that he has "No Difficulty" (Tr. 355).

pain (Tr. 405).  Plaintiff denied experiencing any shortness of breath or wheezing (Tr. 405).  Upon examination, Dr. Stefanides found that plaintiff had an antalgic gait and that kneeling and squatting were accomplished with a moderate degree of difficulty (Tr. 405).  Dr. Stefanides observed that the right knee had a mild varus deformity with moderate effusion (Tr. 405).  Plaintiff's right knee strength was limited to 4 out of 5 due to pain and the range of motion in this knee was 5 to 110 with a moderate amount of crepitus (Tr. 405).  Palpation again revealed tenderness at the medial and lateral joint lines and at the patellofemoral joint, but without effusion (Tr. 405).

Dr. Stefanides referred plaintiff to Dr. Yakov Perper at Universal Pain Management who examined plaintiff on January 8, 2014 (Tr. 400).  Plaintiff told Dr. Perper that he had numbness, tingling and weakness in his right knee and that his knee would give way (Tr. 400).  Plaintiff also stated that he had a sharp pain in his knee that improved with elevation and rest, but that standing made the pain worse (Tr. 400).  Plaintiff reported that he was taking Percocet for pain and that the Orthovisc injections he had received from Dr. Stefanides also provided some relief (Tr. 400).  Plaintiff denied experiencing fatigue (Tr. 400).  In his physical examination, Dr. Perper determined that plaintiff was not in acute distress (Tr. 401).  Plaintiff's right knee

18

appeared normal and without swelling or effusion (Tr. 401).  The
knee and the lateral joint line were tender to palpation (Tr.
401).  Dr. Perper's testing revealed decreased range of motion in
the right knee (Tr. 401).  Dr. Perper prescribed Mobic and
continued plaintiff on Percocet (Tr. 401).

On January 13, 2014, plaintiff returned to Dr.
Stefanides for another Orthovisc injection (Tr. 407).  Plaintiff
reported that his knee pain had improved since his first injec-
tion (Tr. 407).  Dr. Stefanides examined plaintiff's right knee
and found that plaintiff had mild varus deformity in his knee,
but no atrophy, ecchymosis[22] or swelling (Tr. 407).  Plaintiff's
right knee strength had improved to 5 out of 5, and Dr.
Stefanides found no effusion or crepitus (Tr. 400).  Plaintiff's
range of motion in his right knee was 0 to 110 degrees with pain
at the end of flexion (Tr. 407).  Palpation again revealed
tenderness at the medial aspect of the proximal tibia and at the
adjoining joint line (Tr. 407).  Plaintiff denied having short-
ness of breath or wheezing (Tr. 407).

On January 20, 2014, plaintiff received a third
Orthovisc injection (Tr. 409).  At this visit, plaintiff reported
that his knee pain had improved since the second Orthovisc

---

[22]Echymosis is "a small hemorrhagic spot . . . in the skin
or mucous membrane forming a nonelevated, round or irregular,
blue or purplish patch."  Dorland's at 588.

injection (Tr. 409).  Dr. Stefanides's clinical findings were
similar to those made at plaintiff's January 13, 2014 visit (Tr.
409).

At plaintiff's follow-up visit on February 17, 2014,
Dr. Stefanides found that plaintiff's right knee showed "definite
improvement with no new problems or positive findings" (Tr. 411).
Dr. Stefanides's notes indicate that plaintiff had experienced
"significant [pain] relief" after receiving a course of three
Orthovisc injections (Tr. 409).

On February 21, 2014, plaintiff returned to Dr. Perper
(Tr. 398).  Dr. Perper's findings were the same as with plain-
tiff's prior visit to his office (Tr. 398).  Dr. Perper continued
plaintiff's Percocet prescription for an additional 30 days, but
discontinued the Mobic (Tr. 399).

### 6.  Pulmonologist Dr. Mohammad Basit

On September 12, 2013, plaintiff was examined by
pulmonologist Dr. Mohammed Basit at the New York Sleep Disorder
Center (Tr. 334).  Plaintiff reported to Dr. Basit that he had
had asthma since 2006, and that attacks were triggered by
weather, climbing more than five flights of stairs and seasonal
allergies (Tr. 334).  Plaintiff stated that he sleeps from
approximately 11:00 PM to 10:00 AM, snores loudly and wakes up

several times in the night (Tr. 334).  Plaintiff further stated
that he dozes all day long (Tr. 334).  Dr. Basit examined plain-
tiff and found that his breath sounds were normal (Tr. 335).

Dr. Basit conducted a diagnostic sleep study the
following day (Tr. 337).  The polysomnography report indicated
that plaintiff had mild sleep apnea (Tr. 337).  Dr. Basit recom-
mended "a repeat study with CPAP [(continuous positive airway
pressure)[23]] initiation and titration[24] during sleep to eliminate
obstructive, apneic and hypopneic[25] episodes" (Tr. 337, 342).
Dr. Basit also recommended that plaintiff avoid driving, operat-
ing heavy machinery or other tasks which required sustained
alertness (Tr. 337).

---

[23]"CPAP, or continuous positive airway pressure, is a treat-
ment that uses mild air pressure to keep the airways open.  CPAP
typically is used by people who have breathing problems, such as
sleep apnea." Cullen v. Comm'r of Soc. Sec., 15 Civ. 1180 (JCF),
2016 WL 3144050 at *2 n.6 (S.D.N.Y. May 19, 2016) (Francis,
M.J.), citing What Is CPAP?, National Heart, Lung, and Blood
Institute, https://www.nhlbi.nih.gov/health/health-
topics/topics/cpap (last visited May 18, 2016).

[24]Titration is the process of determining a component in a
solution "by the addition of a liquid reagent of known strength"
until a desired effect is reached.  Dorland's at 1932.  Dr. Basit
appears to be describing the adjustment of airway pressure to
ascertain the minimum amount of pressure necessary for the CPAP
treatment to be effective.

[25]Hypopnea is an "abnormal decrease in the depth and rate of
breathing." Dorland's at 905.

On December 2, 2013, before plaintiff underwent the
second polysomnogram, plaintiff's counsel submitted to the ALJ an
undated "Pulmonary Impairment Questionnaire" report completed by
Dr. Basit (Tr. 321-28) ("Dr. Basit's December 2013 Opinion").[26]
Dr. Basit indicated that plaintiff had a diagnosis of asthma and
sleep apnea, with a "fair" prognosis (Tr. 322-23).  Dr. Basit
listed the clinical findings as shortness of breath and wheezing,
with reported symptoms of extreme sleepiness (Tr. 323-24).  Dr.
Basit characterized the severity of plaintiff's asthma attacks as
"moderate" (Tr. 324).  Dr. Basit stated that plaintiff needed
nebulizer[27] treatments with albuterol to treat his asthma (Tr.
324).  Dr. Basit opined that plaintiff's fatigue and other
symptoms were severe enough to interfere constantly with his
attention and concentration (Tr. 327).  Dr. Basit further opined
that plaintiff would need to take 15-20 minute unscheduled breaks
two to three times during the work day and would be absent from
work more than three times a month as a result of his impairments
(Tr. 327).  Dr. Basit opined that in an eight-hour workday
plaintiff could sit for three hours and stand for up to one hour
(Tr. 325).  Dr. Basit stated that plaintiff could lift five to

---

[26]Dr. Basit signed the form but did not date it (Tr. 328).

[27]Nebulizer refers to "a device for creating and throwing an
aerosol spray."  Dorland's at 1234.

ten pounds frequently and would need to avoid wet conditions, odors, fumes, temperature extremes, humidity, dust, perfumes, gases, solvents, chemicals, cigarette smoke and soldering fluxes (Tr. 325, 327-28).

Plaintiff saw Dr. Basit for a follow-up visit on December 11, 2013, during which Dr. Basit went over the results of the sleep study (Tr. 342). Dr. Basit diagnosed plaintiff with obstructive sleep apnea, but noted that the severity was most likely underestimated in the sleep study because plaintiff had only a limited amount of sleep (Tr. 342).

Dr. Basit performed a second sleep study on January 5, 2014, with the use of CPAP therapy (Tr. 392). The second polysomnography report indicates that "CPAP was applied" during the study and "several levels of pressure were attempted. At pressure of 6.0 cm/H20, there was substantial improvement in obstructive apneic and hypopneic events noted" (Tr. 392). The report thus concluded that CPAP therapy had been successful in treating plaintiff's "sleep apnea/hypopnea" and that "[o]ptimal pressure was felt to be 6.0 cm H20" (Tr. 392). Dr. Basit recom-mended that plaintiff do a "treatment trial with CPAP at a pressure of 6.0 cm/H20 during sleep" and lose weight (Tr. 392).

D.   Proceedings Before the ALJ

    1.   Plaintiff's Testimony

        Plaintiff testified at the December 2013 hearing that he was disabled because of knee pain, fatigue caused by sleep apnea, eczema and asthma (Tr. 45-64).  Plaintiff testified that he lives with his parents and brother on the second floor of a walk-up apartment building (Tr. 46-47).  Plaintiff was terminated from his job because his supervisor found him sleeping on the job after plaintiff had an asthma attack at work (Tr. 43).  Plaintiff testified that, after losing his job, he started collecting unemployment benefits (Tr. 58).  Once those benefits terminated, plaintiff applied for disability benefits (Tr. 58).

        Plaintiff explained that he had no medical records for the period from 2010 through 2013 because he had no insurance during that period (Tr. 57-58).  Plaintiff also stated that he did not have any asthma attacks during that time period (Tr. 59).

        Plaintiff testified that he had traveled to the hearing by train with his mother (Tr. 45).  Plaintiff explained that he used a cane and that he can walk two the three blocks at a time (Tr. 47, 54).  Plaintiff testified that he had difficulty climb-ing the stairs to his apartment because he suffers from shortness of breath (Tr. 46-47).  Plaintiff did not have any problems

24

dressing himself or getting in and out of the shower (Tr. 47).
He testified that he walked to church, a distance of approxi-
mately one and one-half blocks (Tr. 29, 48-49).  Plaintiff
initially testified that he did not have a problem with sitting
(Tr. 54), but later testified that he could only sit for 15 to 20
minutes before his legs went numb and he needed to stand (Tr.
59).  Plaintiff testified that his doctors instructed him not to
lift more than five to ten pounds (Tr. 59).  Plaintiff also
stated that he was constantly napping due to the sleep apnea (Tr.
55, 60, 62).

Plaintiff characterized his asthma as very severe and
stated that two to three times a week his asthma symptoms were so
severe that he would need to use his inhaler or his nebulizer
constantly (Tr. 53, 62-63).  Plaintiff further stated that he had
"extreme" knee pain that would particularly bother him on cold
and rainy days (Tr. 53, 63-64).

### 2.  Vocational Expert Testimony

Peter Massey, a vocational expert, also testified at
the hearing (Tr. 65-72).  The ALJ asked Mr. Massey about a
hypothetical individual with plaintiff's education and prior work

25

experience, who could perform sedentary work,[28] but could climb
ramps and stairs only occasionally, never crawl or climb ladders,
ropes, or scaffolds and only occasionally stoop, crouch, or kneel
(Tr. 68).  The ALJ further asked Mr. Massey to assume that such
an individual could not be frequently exposed to temperature
extremes, irritants, wet conditions or humidity, poorly venti-
lated areas, chemicals or moving machinery and unprotected
heights (Tr. 69).  Mr. Massey testified that such an individual
could work in jobs defined in the Dictionary of Occupational
Titles ("DOT") as an addressor, table worker, or order clerk,
each of which were sedentary unskilled jobs existing in substan-
tial numbers in the regional economy (Tr. 69-70).  Mr. Massey
also testified that if this individual were off task five percent
of the day with an option to sit and stand at will, he could
still perform these jobs, but that if he was off task twenty
percent of the day he could not perform any work (Tr. 71).  Mr.

---

[28]The regulations define "sedentary work" as that work which

> involves lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket
> files, ledgers, and small tools.  Although a sedentary
> job is defined as one which involves sitting, a certain
> amount of walking and standing is often necessary in
> carrying out job duties.  Jobs are sedentary if walking
> and standing are required occasionally and other seden-
> tary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

Massey also testified that an individual who has to miss work three times a month or is limited to sit three hours and stand/walk for one hour in an eight hour work day could not work (Tr. 72).

III.  <u>Analysis</u>

    A.  Applicable
       <u>Legal Principles</u>

       1.  <u>Standard of Review</u>

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008).  Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency."  <u>Lesterhuis v. Colvin</u>, 805 F.3d 83, 87 (2d Cir. 2015), <u>quoting</u> <u>Burgess v. Astrue</u>, 537 F.3d 117, 128 (2d Cir. 2008).

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  <u>Byam v. Barnhart</u>, 336 F.3d 172, 179 (2d

Cir. 2003), <u>citing</u> <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.).  However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."  <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Talavera v. Astrue</u>, <u>supra</u>, 697 F.3d at 151, <u>quoting</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (<u>per</u> <u>curiam</u>), <u>quoting</u> <u>Schauer v. Schweiker</u>, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be

drawn.'"  Selian v. Astrue, supra, 708 F.3d at 417 (citation

omitted).


      2.  Determination
        of Disability


     A claimant is entitled to SSI and DIB if the claimant

can establish an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment . . . which has lasted or can be expected to

last for a continuous period of not less than twelve months."[29]

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v.

Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the

inability to work must last twelve months).  In addition, to

obtain DIB, the claimant must have become disabled between the

alleged onset date and the date on which he was last insured.

See 42 U.S.C. §§ 416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315;

McKinstry v. Astrue, 511 F. App'x 110, 111 (2d Cir. 2013) (sum-

mary order), citing Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir.

2008).

---

    [29]The standards that must be met to receive SSI benefits
under Title XVI of the Act are the same as the standards that
must be met in order to receive DIB under Title II of the Act.
Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases
addressing the former are equally applicable to cases involving
the latter.

The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D) and it must be "of such severity" that the claimant cannot perform his previous work and "cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), § 1382c(a)(3)(B).  Whether such work is actually available in the area where the claimant resides is immaterial.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age and work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (internal quotation marks omitted).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)(v); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151.  The first

30

step is a determination of whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment."  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If he does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  To be found disabled based on a listing, the claimant's medically determinable impairment must satisfy all of the criteria of the relevant listing.  20 C.F.R. § 404.1525(c)(3); Sullivan v. Zebley, 493 U.S. 521, 530 (1990); Otts v. Comm'r of Soc. Sec., 249 F. App'x 887, 888 (2d Cir. 2007).  If the claimant meets a listing, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

     If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform his past relevant work given his RFC.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25.  If he cannot, then the fifth step requires assessment of whether, given claimant's RFC, he can make an adjustment to other work.  20 C.F.R. §§ 404.1520(a)(4)(v),

416.920(a)(4)(v).  If he cannot, he will be found disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite his limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in para-graphs (b),(c) and (d) of 20 [C.F.R. §§] 404.1545 and 416.945." Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting Social Security Ruling 96-8p, 1996 WL 374184 at *1 (July 2, 1996).  The results of this assessment determine the claimant's ability to perform the exertional demands[30] of sus-tained work which may be categorized as sedentary, light, medium, heavy or very heavy.  20 C.F.R. §§ 404.1567, 416.967; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998).  This ability may then be found to be limited further by nonexertional factors that restrict claimant's ability to work.[31]  See Michaels v. Colvin,

---

[30]Exertional limitations are those which "affect [plain-tiff's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. §§  404.1569a(b), 416.969a(b).

[31]Nonexertional limitations are those which "affect only [plaintiff's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of

(continued...)

621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than his past work.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005).

In some cases, the Commissioner can rely exclusively on the medical-vocational guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step.  Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995).  "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful

---

[31](...continued)
nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching.  20 C.F.R. §§ 404.1569a(c), 416.969a(c).

work which exists in the national economy."  Gray v. Chater,
supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388
F.3d at 383.

Exclusive reliance on the Grids is not appropriate
where nonexertional limitations "significantly diminish [a
claimant's] ability to work."  Bapp v. Bowen, 802 F.2d 601, 603
(2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383.
"Significantly diminish" means "the additional loss of work
capacity beyond a negligible one or, in other words, one that so
narrows a claimant's possible range of work as to deprive him of
a meaningful employment opportunity."  Bapp v. Bowen, supra, 802
F.2d at 606; accord Selian v. Astrue, supra, 708 F.3d at 421;
Zabala v. Astrue, supra, 595 F.3d at 411.  When the ALJ finds
that the nonexertional limitations significantly diminish a
claimant's ability to work, then the Commissioner must introduce
the testimony of a vocational expert or other similar evidence in
order to prove "that jobs exist in the economy which the claimant
can obtain and perform."  Butts v. Barnhart, supra, 388 F.3d at
383-84 (internal quotation marks and citation omitted); see also
Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an indi-
vidual's capabilities are not described accurately by a rule, the
regulations make clear that the individual's particular limita-
tions must be considered.").  An ALJ may rely on a vocational

expert's testimony presented in response to a hypothetical if
there is "substantial record evidence to support the
assumption[s] upon which the vocational expert base[s] his
opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir.
1983); accord Snyder v. Colvin, 15-3502, 2016 WL 3570107 at *2
(2d Cir. June 30, 2016) (summary order) ("When the hypothetical
posed to the vocational expert is based on a residual functional
capacity finding that is supported by substantial evidence, the
hypothetical is proper and the ALJ is entitled to rely on the
vocational expert's testimony."); Rivera v. Colvin, 11 Civ. 7469,
2014 WL 3732317 at *40 (S.D.N.Y. July 28, 2014) (Swain, D.J.)
("Provided that the characteristics described in the hypothetical
question accurately reflect the limitations and capabilities of
the claimant and are based on substantial evidence in the record,
the ALJ may then rely on the vocational expert's testimony
regarding jobs that could be performed by a person with those
characteristics.").

### 3. Treating Physician Rule

In considering the evidence in the record, the ALJ must
give deference to the opinions of a claimant's treating physi-
cians. A treating physician's opinion will be given controlling
weight if it is "well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2);[32] see also Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

        "[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).  The Second Circuit has noted that it "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'"  Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order), quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015).  Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the

---

        [32]The Social Security Administration recently adopted regulations that alter the standards applicable to the review of medical opinion evidence for claims filed on or after March 27, 2017.  See 20 C.F.R. §§ 404.1520c, 416.920c.  Because plaintiff's claim was filed before that date, those amended regulations do not apply here.

amount of weight the opinion should be given.  These factors include:  (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.); Matovic v. Chater, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996) (McKenna, D.J.).  Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor.  Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted.  See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see also Atwater v. Astrue, supra, 512 F. App'x at 70; Petrie v.

Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order);
Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary
order).  "The opinions of examining physicians are not control-
ling if they are contradicted by substantial evidence, be that
conflicting medical evidence or other evidence in the record."
Krull v. Colvin, 15-4016, 2016 WL 5417289 at *1 (2d Cir. Sept.
27, 2016) (summary order) (citation omitted); see also Monroe v.
Commr. of Social Sec., 16-1042-CV, 2017 WL 213363 at *1 (2d Cir.
Jan. 18, 2017).  The ALJ is responsible for determining whether a
claimant is "disabled" under the Act and need not credit a
treating physician's determination to this effect where it is
contradicted by the medical record.  See Wells v. Comm'r of Soc.
Sec., 338 F. App'x 64, 66 (2d Cir. 2009) (summary order).  The
ALJ may rely on a consultative opinion where it is supported by
substantial evidence in the record.  See Richardson v. Perales,
supra, 402 U.S. at 410; Camille v. Colvin, 652 F. App'x 25, 27-28
(2d Cir. 2016) (summary order); Diaz v. Shalala, 59 F.3d 307, 313
n.5 (2d Cir. 1995); Mongeur v. Heckler, supra, 722 F.2d at 1039.

   4.  Credibility

     In determining a claimant's RFC, the ALJ is required to
consider the claimant's reports of pain and other limitations, 20
C.F.R. § 416.929, but is not required to accept the claimant's

subjective complaints without question.  McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980). "It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983); see also Mimms v. Heckler, 750 F.2d 180, 185-86 (2d Cir. 1984); Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591-92 (2d Cir. 1984).  The ALJ has discretion to assess the credibility of the claimant's testimony in light of the medical findings and other evidence in the record.  Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

The regulations provide a two-step process for evaluating a claimant's subjective assertions of disability.

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  20 C.F.R. § 404.1529(b).  That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability.  20 C.F.R. § 404.1529(a).  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record.  Id.  The ALJ must consider "[s]tatements [the claimant] or others make about [the claimant's] impairment(s), [the claimant's] restrictions, [the claimant's] daily activities, [the claimant's] efforts to work, or any other relevant statements [the claimant] make[s] to medical sources during the course of examination or treatment, or to [the agency] during inter-

> views, on applications, in letters, and in testimony in
> [its] administrative proceedings."  20 C.F.R. §
> 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a);
> S.S.R. 96-7p.

Genier v. Astrue, supra, 606 F.3d at 49 (alterations and emphasis

in original); see also 20 C.F.R. § 416.929(a); Snyder v. Colvin,

15-3502, 2016 WL 3570107 at *2 (2d Cir. June 30, 2016) (summary

order), citing SSR 16-3P, 2016 WL 1119029 (Mar. 16, 2016).[33]  The

ALJ must explain a decision to reject a claimant's testimony

"'with sufficient specificity to enable the [reviewing] Court to

decide whether there are legitimate reasons for the ALJ's disbe-

lief' and whether [the ALJ's] decision is supported by substan-

tial evidence."  Calzada v. Astrue, 753 F. Supp. 2d 250, 280

(S.D.N.Y. 2010) (Sullivan, D.J.) (alteration in original),

quoting Fox v. Astrue, 05 Civ. 1599 (NAM)(DRH), 2008 WL 828078 at

*12 (N.D.N.Y. Mar. 26, 2008); see also Lugo v. Apfel, 20 F. Supp.

2d 662, 664 (S.D.N.Y. 1998) (Rakoff, D.J.).  The ALJ's determina-

tion of credibility is entitled to deference.  See Snell v.

Apfel, 177 F.3d 128, 135-36 (2d Cir. 1999) ("After all, the ALJ

is in a better position to decide issues of credibility");

Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995)

(Leisure, D.J.) ("Deference should be accorded the ALJ's determi-

---

[33]SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2,
1996), and clarifies the policies set forth in the previous SSR.
See SSR 16-3P, supra, 2016 WL 1237954.

nation because he heard Plaintiff's testimony and observed his demeanor.").

B.   The ALJ's
     Decision

The ALJ applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 24-40).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity during the relevant period (Tr. 26).

At step two, the ALJ found that plaintiff suffered from the following severe impairments:  "right knee arthroscopy,[34] sleep apnea, asthma, eczema, and obesity" (Tr. 26).

At step three, the ALJ found that plaintiff's disabilities did not meet the criteria of the listed impairments and that plaintiff was not, therefore, entitled to a presumption of disability (Tr. 26-27).  In reaching his conclusion, the ALJ specifically analyzed whether plaintiff met the following listings:  Listing 1.02, Major dysfunction of a joint(s) (due to any cause), Listing 3.03 Asthma and Listing 3.10 Sleep-related breathing disorders and noted that there are no specific listings

---

[34]An arthroscopy is a procedure and not an impairment.  The ALJ's discussion, however, makes clear that the ALJ considered the impact of plaintiff's right knee condition as a severe impairment.

regarding eczema or obesity (Tr. 26-27).  20 C.F.R. Pt. 404,
Subpt. P, App. 1.

The ALJ then determined that plaintiff retained the
RFC to perform sedentary work except that

> he can only occasionally climb ramps and stairs, and
> never climb ladders, ropes, or scaffolds.  He can only
> occasionally stoop, crouch, and kneel, and never crawl.
> The claimant must avoid concentrated exposure to ex-
> treme heat and cold, wetness and humidity, and irri-
> tants such as fumes, odors, dust and gases, poorly
> ventilated areas, and chemicals.  He must avoid all
> exposure to moving machinery and unprotected heights.
> In addition, the claimant is limited to work allowing
> him to be off-task for 5% of the day, in addition to
> regularly scheduled breaks.

(Tr. 27).

To reach his RFC determination, the ALJ examined the
opinions of the treating and consulting physicians and assessed
the weight to give to each opinion based on the objective medical
record, including the treatment notes of the physicians who
treated plaintiff subsequent to his alleged onset date (Tr. 29-
33).

The ALJ gave "some weight" to some of the opinions of
plaintiff's treating pulmonologist Dr. Basit (Tr. 32).  The ALJ
found that Dr. Basit's opinion that plaintiff could lift and
carry up to ten pounds, that he needed to avoid wet conditions,
odors, fumes, temperature extremes, humidity and dust was sup-
ported by the evidence and gave this opinion "some weight" (Tr.

42

32).   However, the ALJ found that three of Dr. Basit's opinions
were not supported by the evidence, namely that plaintiff's
fatigue and other symptoms were so severe that they constantly
interfered with his attention and concentration, that plaintiff
needed 15-20 minute unscheduled breaks every two to three hours
and that plaintiff would be absent from work more than three
times a month (Tr. 32).   The ALJ found that these opinions were
not consistent with Dr. Basit's own report that indicated that
plaintiff had moderate asthma symptoms and plaintiff's reports to
Dr. Alla during the same time period (Tr. 32).

        The ALJ gave "some weight" to treating surgeon Dr.
Stefanides' opinions that plaintiff could sit for a total of four
hours, stand/walk for up to one hour in an eight-hour workday and
that his symptoms would cause him to be absent from work more
than three times a month (Tr. 32).   The ALJ found that these
opinions were only entitled to "some weight" because Dr.
Stefanides' own report was less "restrictive" and indicated that
plaintiff walked effectively with a cane and was able to take
care of his activities of daily living (Tr. 32).   The ALJ also
noted that the opinions were formed while plaintiff was still
recovering from knee surgery and did not reflect plaintiff's
long-term condition (Tr. 32).

The ALJ, however, gave "great weight" to the September 2012 opinion of consultative examiner Dr. Montalvo that plaintiff's severe skin and respiratory impairments caused plaintiff to have a moderate limitation in walking and climbing stairs and that he should avoid any dust, environmental pollutants and smoke (Tr. 32).  The ALJ found that this opinion was supported by evidence in the record as a whole, which demonstrated that plaintiff's chronic asthma and eczema were treated with medications and that plaintiff's reports that he could perform activities his usual activities of daily living despite these impairments (Tr. 32).

In reaching his RFC determination, the ALJ also considered plaintiff's testimony and found that while plaintiff's medically determinable impairments could reasonably have caused his alleged symptoms, a review of the entire case record showed that plaintiff's statements regarding their intensity, persistence and limiting effects were not entirely credible (Tr. 29). The ALJ found that plaintiff's testimony regarding his right knee pain, asthma and sleep apnea was inconsistent with his contemporaneous reports to Drs. Alla and Stefanides and inconsistent with the doctors' own assessments of plaintiff's abilities (Tr. 29, citing Ex. 10F at 4 & Ex. 15F).  For example, plaintiff told Dr. Alla in August 2013 that he was feeling fine, denied chest pain

44

or shortness of breath (Tr. 29, <u>citing</u> Ex. 10F).  Further, the
ALJ found that plaintiff's testimony regarding the extent of his
limitations was also inconsistent with his own testimony that he
could walk one and a half blocks to church and that he could use
public transportation (Tr. 28-29).

      At step four, the ALJ concluded that, based on the
vocational expert's testimony, plaintiff was unable to perform
his past relevant semi-skilled work as an automobile mechanic and
delivery truck driver (Tr. 33).

      At step five, again relying on the testimony of the
vocational expert, the ALJ found that jobs existed in significant
numbers in the national economy that plaintiff could perform,
given his RFC, age and education (Tr. 33-34).  The ALJ noted that
the vocational expert testified that given plaintiff's age,
education, work experience and RFC, he could perform the un-
skilled sedentary work defined in the DOT as addressor, table
worker and order clerk (Tr. 34).  The ALJ noted that (1) the job
of addressor, DOT code 209.587-010, is unskilled sedentary work
and that there are 35,626 such positions nationally; (2) the job
of table worker, DOT code 739.687-182, is unskilled sedentary
work and that there are 13,656 such positions nationally and (3)
the job of order clerk, DOT code 209.567-014, is unskilled
sedentary work and that there are 98,429 such positions nation-

ally (Tr. 34).  Concluding that the expert's testimony was consistent with information in the DOT, the ALJ determined plaintiff could perform those occupations and accordingly was not disabled (Tr. 34).

### C.   Analysis of the ALJ's Decision

Plaintiff argues that the ALJ's decision should be reversed because the ALJ did not give adequate deference to the opinions of plaintiff's treating physicians and because the ALJ failed to evaluate plaintiff's credibility properly (Pl. Mem. of Law in Support of Judgment on the Pleadings, dated February 5, 2016, (D.I. 20) ("Pl. Mem.")).  The Commissioner contends that the ALJ correctly applied the relevant legal principles and that his decision was supported by substantial evidence (Def. Mem. of Law in Support of Judgment on the Pleadings, dated May 6, 2016 (D.I. 26)).

### 1.   Treating Physician Rule

Although the ALJ did not expressly address the six factors relevant to evaluating a treating physician's opinion, the ALJ provided good reasons for affording less weight to the plaintiff's treating physicians' opinions.

The ALJ's decision to give Dr. Stefanides' October 25, 2013 opinion less than controlling weight was not erroneous because the opinion was contradicted in part by the doctor's own objective findings in plaintiff's treatment records.  One month after plaintiff's knee surgery, Dr. Stefanides opined that plaintiff's limitations were so severe that they would likely cause him to be absent from work more than three times a month (Tr. 350).  The doctor also indicated that it was "unknown" whether plaintiff's limitations would last for 12 consecutive months as required for a finding of disability (Tr. 32, 350). Because his opinion did not state whether plaintiff's limitations would persist past the short-term post-operative stage, the ALJ gave it only some weight in determining plaintiff's RFC (Tr. 32, 350).[35]  As the ALJ noted (Tr. 29-30), the record indicates that plaintiff's condition improved after October 2013 (Tr. 405, 407).

---

[35]Dr. Stefanides also stated that the "earliest date that the description of symptoms and limitations in [the] questionnaire applies" was "approximately 8/2012" (Tr. 351). However, plaintiff's first visit with Dr. Stefanides was in August 2013, not 2012 -- therefore, Dr. Stefanides' opinion would have been based entirely on plaintiff's own statements about when the pain first started (Tr. 345).  Stefanides' initial visit notes indicate that plaintiff told him that his knee pain started a year earlier, i.e., in August 2012 (Tr. 315).  However, as indicated above, in September of 2012, plaintiff did not complain of knee pain to Dr. Montalvo during a consultative examination (Tr. 283-86).  Dr. Montalvo also conducted a physical examination in which she found that plaintiff had full range of motion in both knees and full strength in both lower extremities (Tr. 283-84).

Plaintiff's physical therapist noted in November 2013 that plaintiff had full extension of his knee (Tr. 354). Plaintiff's strength had improved by the end of January 2014 to 5 out of 5 in all muscle groups (Tr. 401). Dr. Stefanides indicated on February 17, 2014 that plaintiff had "significant relief" from pain as a result of Orthovisc injections and found that overall there had been "definite improvement, with no new problems or positive findings" (Tr. 411). Therefore, Dr. Stefanides' statement in the October 2013 opinion that the duration of plaintiff's limitations was unknown and the treatment records that show that there was improvement in plaintiff's pain after physical therapy and Orthovisc injections further support the ALJ's decision to give less than controlling weight to Dr. Stefanides' October 2013 opinion.

On the other hand, in finding that plaintiff could do sedentary work with additional restrictions, the ALJ took into account Dr. Stefanides's assessment that plaintiff's right knee impairment would limit his ability to sit and stand during the workday (Tr. 32-33). Before the improvements in plaintiff's conditions described above, Dr. Stefanides opined that plaintiff could sit for up to four continuous hours in an eight hour workday (Tr. 348). Further, Dr. Stefanides did not opine that plaintiff could not stand at all; rather, he concluded that

48

plaintiff could stand for up to one hour in an eight hour workday
and could walk with a cane (Tr. 347-48).  Sedentary jobs require
sitting for approximately six non-continuous hours in an eight-
hour workday and walking and standing "occasionally," which would
generally total no more than about 2 hours of an 8-hour workday.
See Social Security Ruling 96-9P, 1996 WL 374185 at *3 (SSA July
2, 1996).  The ALJ also further restricted this sedentary work
activity by indicating that plaintiff would need to be off task
for five percent of the workday, in addition to regularly sched-
uled breaks (Tr. 27).  Given the improvements in plaintiff's
functioning noted by Dr. Stefanides following his October 2013
assessment, the ALJ's finding that plaintiff could perform the
sitting and standing requirements of sedentary work, with addi-
tional restrictions, took into account both Dr. Stefanides'
opinions and the objective findings.  The ALJ's RFC finding also
incorporated other limitations noted by Dr. Stefanides, including
that plaintiff could only occasionally climb ramps and stairs,
stoop, crouch or kneel and never crawl or climb ladders, ropes or
scaffolds (Tr. 27, 32, 347-48).  Therefore, the ALJ's decision to
give only "some weight" to Dr. Stefanides' opinions regarding
plaintiff's limitations immediately following his surgery and to
rely more heavily on the doctor's treatment records was supported
by good reasons.

The ALJ also gave good reasons for giving only "some weight" to Dr. Basit's December 2013 Opinion that plaintiff's symptoms were so severe that he would need unscheduled breaks every two to three hours and would be absent from work more than three times a month, namely, the doctor's treatment records and objective testing did not support the opinion (Tr. 28-29, 32). As noted above, it was well-established from the medical records that plaintiff's asthma, even by Dr. Basit's own assessment, was of moderate severity and was controlled by medication (Tr. 32, 323-24). In October 2013, plaintiff reported to Dr. Alla that he was feeling fine and did not have chest pain, shortness of breath, and palpitation either at rest or with exertion (Tr. 293-95; see also Tr. 311, 313, 315, 405, 407, 409 (September 2013 through January 2014 treatment notes from Dr. Stefanides indicating that plaintiff denies having a cough, shortness of breath chest pain or wheezing)). As for plaintiff's sleep apnea, which plaintiff argues is his "primary disabling pulmonary issue" (Pl. Mem. at 11), there is evidence that it too improved with treatment (Tr. 30, 337). Plaintiff's second sleep test demonstrated that CPAP therapy was effective in treating plaintiff's sleep apnea (Tr. 30, 392). The study indicated that, with the proper amount of pressure, "substantial improvement in obstructive apneic and hypopneic events [was] noted" and Dr. Basit recom-

mended that plaintiff continue with a treatment trial of CPAP using that level of pressure (Tr. 392).  Thus, the ALJ did not err in finding that Dr. Basit's opinion regarding the long-term severity of plaintiff's asthma and sleep apnea was contradicted by the treatment record.

Further, although the ALJ found that Dr. Basit's opinion that plaintiff would need to be off task 15-20 minutes every two to three hours was unsupported by the medical record, the ALJ found that plaintiff was limited to work that allowed him to be off-task for five percent of the day in addition to regularly scheduled breaks (Tr. 27).  This assessment was consistent with the treatment notes that indicate that plaintiff's sleep apnea improved with treatment, his asthma was under control, and he had no shortness of breath, wheezing, chest pain or cough as long as he complied with his medication regimen (Tr. 291-96, 311, 313, 323-25, 343, 405, 407, 409).  Indeed, there is no evidence that plaintiff's asthma or sleep apnea stopped him from accomplishing his activities of daily living (Tr. 29, 143).  The ALJ's assessment of plaintiff's need for breaks, therefore, took into account the possibility that plaintiff's asthma and sleep apnea may require him to take some unscheduled breaks.

Finally, the ALJ did give weight to those portions of Dr. Basit's opinion that were not contradicted by the medical

record.  The ALJ relied on Dr. Basit's opinion that plaintiff must avoid concentrated exposure to extreme heat and cold, wet conditions and humidity and irritants such as fumes, odors, dust and gases, poorly ventilated areas and chemicals (Tr. 27, 32). The ALJ also gave weight to Dr. Basit's opinion regarding plaintiff's ability to lift and carry up to ten pounds in finding that plaintiff was limited to sedentary work.  See Social Security Ruling 96-9P, supra, 1996 WL 374185 at *6.

        The ALJ also did not err in giving "great weight" to Dr. Montalvo's September 2012 assessment of plaintiff's respiratory and skin impairments.  Plaintiff argues that Dr. Montalvo's assessment was flawed because Dr. Montalvo failed to consider the effects of plaintiff's torn meniscus or his sleep apnea, which are the "primary causes of [his] disability" (Pl. Mem. at 12). However, the ALJ did not rely on Dr. Montalvo's report to analyze those conditions because there is no evidence that plaintiff was being treated for or was complaining of these impairments as of the date of Dr. Montalvo's examination (Tr. 283).  Rather, the ALJ relied on Dr. Montalvo's opinion concerning the effects of plaintiff's chronic asthma and eczema on his ability to function on a daily basis (Tr. 32).  The ALJ found that Dr. Montalvo's assessment -- based on plaintiff's statements to her and a physical examination -- that plaintiff had "moderate" limitations

on his ability to walk and climb stairs and that he should avoid
dust, environmental pollutants and smoke was consistent with the
medical treatment records from plaintiff's treating physicians
which showed that plaintiff's respiratory and skin conditions
were treated with medication (Tr. 32, 286).  Although Dr.
Montalvo conducted a physical examination of plaintiff's knees,
the ALJ did not rely on the findings from that examination to
assess plaintiff's knee impairment, which developed at a later
time (Tr. 29, 31-32).  Rather, the ALJ only noted that plaintiff
made no complaints about his knee to Dr. Montalvo (Tr. 29).
Therefore, the ALJ did not err in relying on Dr. Montalvo's
assessment of the limiting effects of plaintiff's asthma and
eczema.

     Plaintiff also argues that the ALJ committed error in
relying on Dr. Montalvo's opinion because there is no evidence
that Dr. Montalvo reviewed plaintiff's medical records.  Plain-
tiff is correct that, generally, opinions from consultative
physicians are not entitled to significant weight, in particular
where the physicians do not have the benefit of the complete
medical record.  See Selian v. Astrue, supra, 708 F.3d at 419
("We have previously cautioned that ALJs should not rely heavily
on the findings of consultative physicians after a single exami-
nation." (citation omitted)); Tarsia v. Astrue, 418 F. App'x 16,

18 (2d Cir. 2011) (summary order) ("Because it is unclear whether
[the consulting physician] reviewed all of [plaintiff's] relevant
medical information, his opinion is not 'supported by evidence of
record' as required to override the opinion of [the] treating
physician"); Gunter v. Commissioner of Social Security, 361 F.
App'x 197, 200 (2d Cir. 2010) (summary order) ("Consideration of
[plaintiff's] entire medical records might have altered [the non-
examining doctor's] conclusions."); but see Camille v. Colvin,
supra, 2016 WL 3391243 at *3 n.4 ("No case or regulation [plain-
tiff] cites imposes an unqualified rule that a medical opinion is
superseded by additional material in the record, and in this case
the additional evidence does not raise doubts as to the reliabil-
ity of [the consulting doctor's] opinion.").  Here, however, the
ALJ found that the consulting examiner's opinions were consistent
with the treatment records, and plaintiff has not identified any
evidence that should have altered Dr. Montalvo's conclusions
regarding plaintiff's asthma and eczema.  The ALJ found that Dr.
Montalvo's assessment of plaintiff's asthma and eczema was
supported by other evidence in the record which showed that these
conditions were successfully treated with medication and that,
despite these impairments, plaintiff felt better and retained the
physical capacity to perform sedentary work with additional

restrictions (Tr. 31-32, 96, 347-48, 323-25, 311, 313, 343, 405, 407, 409).

Thus, the ALJ carefully summarized the medical evidence from numerous treating physicians, described plaintiff's physical symptoms and progress and fairly assessed plaintiff's RFC based on those opinions that were supported by the substantial evidence in the record.

### 2. Credibility

The ALJ's analysis of the credibility of plaintiff's testimony about the pain and limitations caused by his knee condition, asthma and sleep apnea parallels his assessments of the reports of plaintiff's treating and consulting physicians. As discussed above, although plaintiff had these severe conditions, the evidence in the record demonstrated that these conditions improved with treatment prescribed or administered by plaintiff's treating physicians.  Thus, the ALJ's credibility assessment was supported by substantial evidence.

With respect to plaintiff's asthma, plaintiff's testimony that he was using an inhaler several times a day (Tr. 53) was inconsistent with his reports to his doctors.  The treatment notes indicated that plaintiff's asthma was moderate and controlled when plaintiff followed his medication regimen.  From

June through September 2013, plaintiff took medication for his
asthma and reported to Dr. Alla that he had no complaints of
chest pain or shortness of breath; Dr. Alla advised plaintiff to
continue taking his medication and engage in at least a few hours
of moderate aerobic exercise weekly (Tr. 291-95, 300-04).  In
September 2013, two months before the hearing, plaintiff reported
to Dr. Alla that he felt fine and denied any symptoms of chest
pain, shortness of breath and palpation, either at rest or with
exertion (Tr. 293-94).  Plaintiff also told Dr. Alla that he had
stopped taking his asthma medication for a few days and the
doctor had to reinforce with plaintiff the importance of taking
his medication on a regular basis (Tr. 295).  Plaintiff also
consistently told Dr. Stefanides that he did not suffer from
shortness of breath, cough or wheezing (Tr. 311, 313, 315, 405,
407, 409).  In Dr. Basit's December 2013 Opinion, he character-
ized plaintiff's asthma attacks as "moderate" and stated that
plaintiff needed albuterol a few times a week (Tr 324).  In a
progress report from that month Dr. Basit also reported that
plaintiff had "normal breath sounds" in his chest (Tr. 384).
During a January 2014 visit with Dr. Basit, plaintiff denied
having any chest pain or cough, and Dr. Basit again found that
plaintiff had "normal breath sounds" in his chest (Tr. 385).
Thus, the ALJ's finding that plaintiff's testimony concerning the

severity of his asthma was not entirely credible was not errone-
ous.

Further, plaintiff's testimony that he had "extreme"
pain in his knee that severely limited his ability to function
(Tr. 53-55, 63) was contradicted by the record that showed that
his limitations and pain improved after surgery and treatment.
Following his surgery, Dr. Stefanides reported that plaintiff
walked effectively with a cane, could bathe and dress himself,
prepare meals and travel without assistance (Tr. 29, 311, 347-48;
see also 285, 294, 298, 301, 303-04, 329, 333).  Dr. Stefanides
stated that medication was completely successful in relieving
plaintiff's knee pain (Tr. 348).  Further, the record shows that
physical therapy and Orthovisc injections subsequent to the
hearing were effective in alleviating plaintiff's pain (Tr. 398-
400, 405, 407, 409, 411).  The ALJ also noted that plaintiff
testified that he could go out alone and use public transporta-
tion (Tr. 46-49).  Thus, the ALJ did not err in finding that
plaintiff's testimony about the extent of his knee pain was
contradicted by the medical record.

The ALJ also considered plaintiff's testimony concern-
ing his sleep apnea to the extent it was consistent with the
evidence.  Plaintiff testified that his sleep apnea was so
disabling that he was constantly falling asleep and could only go

57

out for short periods of time to get fresh air (Tr. 55-56).

However, in August 2012, plaintiff reported to SSA that he went

to the movies, went fishing and visited his children on a regular

basis (Tr. 195).  At the hearing, plaintiff also testified that

he went to church, (Tr. 48), and the record reflects that he

regularly attended doctor's appointments.  Further, the record

shows that plaintiff's sleep apnea improved in January 2014 with

CPAP treatment (Tr. 392).  This evidence contradicts plaintiff's

testimony that his sleep apnea prevented him from doing anything

at all.  Further, based, in part, on plaintiff's sleep apnea, the

ALJ concluded that plaintiff could not return to his previous

work, which required him to drive a truck, but that he could

return to sedentary work with additional limitations.  Thus, the

ALJ's credibility assessment, which recognized that plaintiff had

severe impairments that affected his RFC, but not to the extent

claimed by plaintiff, was not erroneous.

Although plaintiff argues that the ALJ should not have

relied on evidence of plaintiff's ability to conduct his activi-

ties of daily living to determine plaintiff's physical limita-

tions, that evidence was directly relevant to plaintiff's condi-

tion and how it improved over time.  At plaintiff's initial

consultation with Dr. Stefanides in August 2013, plaintiff

reported that the knee pain was interfering with his ability to

conduct his activities of daily living (Tr. 315). However, in October 2013 after plaintiff's surgery, Dr. Stefanides reported that plaintiff could walk with a cane, bathe and dress himself, prepare meals and travel to appointments without assistance (Tr. 32, 311, 347-48). Plaintiff also admitted at the hearing that he traveled to the hearing by train and walked to church, about one and one-half blocks away from his apartment (Tr. 45, 48-49). Although Plaintiff complained of difficulty in using stairs, he was able to live in a second-floor apartment in a building without an elevator (Tr. 46-47, 56). "Evidence that a plaintiff is capable of participating in various activities of daily living despite allegations of severe pain can support a determination that a plaintiff can perform sedentary work." Niven v. Barnhart, 03 Civ. 9359 (DLC), 2004 WL 1933614 at *6 (S.D.N.Y. Sept. 1, 2004) (Cote, D.J.), citing Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980) (noting that the plaintiff's testimony showed that "despite her pains and shortness of breath, she can cook, sew, wash and shop, so long as she does these chores slowly and takes an afternoon rest" and that this testimony "did not preclude the possibility that [the plaintiff] could perform gainful activity of a light, sedentary nature"). Thus, in assessing plaintiff's RFC, the ALJ appropriately considered plaintiff's ability to

perform activities of daily living and how it improved with treatment.

Plaintiff cites a Court of Appeals decision from 1983 for the proposition that a plaintiff with "a good work record is entitled to substantial credibility when claiming inability to work because of a disability." Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983). Plaintiff had earnings in every year since 1986, when he turned 14 years old, and continued to work until the time he was terminated from his job in 2011 (Tr. 171). "Work history, however, is 'just one of many factors' appropriately considered in assessing credibility." Wavercak v. Astrue, 420 F. App'x 91, 94 (2d Cir. 2011) (citation omitted); accord Carvey v. Astrue, 380 F. App'x 50, 53 (2d Cir. 2010). Here, although the ALJ did not discuss plaintiff's long work history, he nonetheless gave good reasons for his credibility finding. The ALJ found that plaintiff's testimony regarding the extent of his limitations was inconsistent with plaintiff's statements to his doctors and the objective medical evidence. Further, the ALJ did credit much of plaintiff's testimony. The ALJ relied on plaintiff's testimony regarding his limitations to find that plaintiff could not do his past relevant work and to find that plaintiff had additional limitations with respect to his ability to do sedentary work (Tr. 27-29, 33).

60

Thus, the ALJ's decision to disregard plaintiff's testimony that his physical limitations were so disabling that he could not work at all was supported by the credible evidence in the record.

### 3. ALJ's Analysis at Step Five:  Vocational Assessment

The ALJ reasonably relied on the testimony of a vocational expert and determined at step five that plaintiff was able to perform other work in the national economy, considering his age, education, work experience and RFC (Tr. 33-34).

Because plaintiff had both exertional and non-exertional limitations, the ALJ properly enlisted the assistance of a vocational expert to assess what kind of work existed in the national economy that plaintiff could perform.  The ALJ posed a hypothetical to the expert that asked him to identify the jobs an individual with plaintiff's RFC and vocational profile could perform (Tr. 68-71).  The ALJ's hypothetical to the vocational expert, as well as the ALJ's decision at steps four and five, were based on RFC assessments that, as detailed above, were supported by substantial evidence.  As noted above, the vocational expert identified three jobs in the national economy that plaintiff could perform with these limitations (Tr. 68-71).  The expert gave the number of these jobs in the regional economy, and

61

the ALJ's decision cited to the number of these jobs that exist in the national economy as well (Tr. 34).  Thus, the vocational expert's testimony, based on plaintiff's RFC, satisfied the Commissioner's burden of showing the existence of alternative substantial gainful employment suited to plaintiff's physical and vocational capabilities.  Accordingly, the ALJ correctly con-cluded that plaintiff was not disabled.

    4. Summary

    In coming to his finding that plaintiff was not dis-abled, the ALJ acknowledged the evidence in the record that supported plaintiff's physical limitations and balanced that evidence against the conflicting evidence.  Although some of plaintiff's doctors opined that plaintiff had more substantial limitations at certain points in time, the evidence showed that these limitations were not permanent and were alleviated with treatment.  The ALJ therefore gave more weight to the opinions of the treating and consulting physicians where those opinions were supported by the treatment records during the relevant time period.  The ALJ's finding that plaintiff could do sedentary work with additional limitations was supported by the substantial evidence in the record.

IV.   Conclusion

        For all the foregoing reasons, plaintiff's motion for
judgment on the pleadings (Docket Item 19) is denied and the
Commissioner's motion for judgment on the pleadings (Docket Item
25) is granted.


Dated:   New York, New York
         February 27, 2017

                              SO ORDERED


                              _____
                              HENRY PITMAN
                              United States Magistrate Judge



Copies transmitted to:

Charles E. Binder, Esq.
Binder and Binder P.C.
Suite 520
60 East 42nd Street
New York, New York 10165

Jeannette Vargas, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, New York  10007